UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD FOY & GWEN FOY, | |
| Plaintiffs, | CIVIL ACTION NO. 3:22-CV-00351 |
| v. | (MEHALCHICK, J.) |
| ENCOMPASS HOME AND AUTO INSURANCE COMPANY, | |
| Defendant. | |

**MEMORANDUM OPINION**

Before the Court is a Motion for Partial Summary Judgment (Doc. 30) filed by Defendant Encompass Home and Auto Insurance Company ("Encompass") in an insurance-coverage action arising from a collision involving Plaintiff Ronald Roy ("Foy"). This action was commenced upon the filing of a complaint by Plaintiff Roy and his wife, Gwen Foy (collectively, "Plaintiffs"). (Doc. 1-3). For the foregoing reasons, Encompass's Motion for Partial Summary Judgment will be **GRANTED**.

I. **BACKGROUND AND PROCEDURAL HISTORY**

This matter comes before the Court upon Defendant's removal from state court to federal court on March 9, 2022. (Doc. 1). This case revolves around an automobile accident that occurred on June 11, 2018, when Foy's car was struck by another third-party driver. (Doc. 1-3, at 6). At the time of the accident, Encompass was the personal automobile insurance and underinsurance carrier for the Plaintiff. (Doc. 1-3, at 6). In their Complaint, Plaintiffs state that as a result of the accident, Foy suffered numerous injuries which required expensive medical care and rendered him unable to work. (Doc. 1-3, at 7-8). According to Plaintiffs, Encompass's settlement of $85,000 was "inadequate to compensate Plaintiffs for their

economic and non-economic damages, past, present, and future, sustained as a result of the subject matter collision." (Doc. 1-3, ¶ 22). Therefore, Plaintiffs allege the following Counts against Encompass: Count I: Breach of Contract and Count II: Insurance Bad Faith. (Doc. 1-3, ¶¶ 18-31, 32-83). Plaintiffs seek relief in the form of damages. (Doc. 1-3, at 22).

On November 28, 2023, Encompass filed a Motion for Partial Summary Judgment, a Statement of Material Facts, accompanying exhibits, and a Brief in Support. (Doc. 30; Doc. 31; Doc. 31-1; Doc. 31-2; Doc. 31-3; Doc. 31-4; Doc. 31-5; Doc. 31-6; Doc. 31-7; Doc. 31-8; Doc. 31-9; Doc. 31-10; Doc. 31-11; Doc. 31-12; Doc. 31-13; Doc. 32). On December 19, 2023, Plaintiffs filed a Brief in Opposition, a Counter Statement of Material Facts, and accompanying exhibits. (Doc. 33; Doc. 33-5; Doc. 33-6; Doc. 33-7; Doc. 33-8; Doc. 33-9; Doc. 33-10; Doc. 33-11; Doc. 33-12; Doc. 33-13; Doc. 33-14; Doc. 33-15; Doc. 33-16; Doc. 33-17; Doc. 33-18; Doc. 33-19; Doc. 33-20; Doc. 33-21; Doc. 33-22; Doc. 33-23; Doc. 33-24). On January 2, 2024, Encompass filed a Reply Brief.[1] (Doc. 34). Accordingly, the matter is ripe for discussion.

II.     **MOTION FOR SUMMARY JUDGMENT STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might

---

[1] In its Reply Brief, Encompass addresses Plaintiffs' argument that Encompass's Brief in Support of their Motion for Partial Summary Judgment should be "disregarded" as it does not comply with Local Rule 7.8 because it exceeds 15 pages. (Doc. 33-2, at 1-2; Doc. 34, at 3). Local Rule 7.8(b)(2) states that a brief may exceed 15 pages so long as it does not exceed 5,000 words. Because Encompass's Brief in Support contains less than 5,000 words (4,102 words), Plaintiffs' argument will be disregarded. (Doc. 33-2, at 1-2; Doc. 34, at 3).

2

affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex, 477 U.S. at 323*. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)*; *see also Thomas v. Delaware State Univ., 626 F. App'x 384, 389 n.6 (3d Cir. 2015)* (not precedential).

III. **STATEMENT OF FACTS**

This factual background is taken from Encompass's Statement of Material Facts and accompanying exhibits. (Doc. 31; Doc. 33-5). Foy was involved in a motor vehicle accident on June 11, 2018 ("the accident"). (Doc. 31, ¶1). Gwen Foy was not involved in the accident. (Doc. 31, at n.1). The third-party driver involved in the accident had $50,000 in liability insurance coverage. (Doc. 31, ¶ 2). The vehicle that Foy occupied at the time of the accident provided $35,000 in primary underinsured motorist coverage ("UIM") coverage. (Doc. 31, ¶ 3). At the time of the accident, Foy was insured by a household automobile insurance policy issued by Encompass (the "Policy"). (Doc. 31, ¶ 4; Doc. 31-1). The Policy provides secondary UIM coverage in the amount of $100,000 per person, and $300,000 per accident, stacked by three vehicles, subject to all of the terms and conditions of the Policy. (Doc. 31, ¶ 5; Doc. 31-1). The Policy states, in pertinent part:

> Underinsured Motorists Coverage Split Limits Stacked – Pennsylvania
>
> * * *
>
> Insuring Agreement
>
> We will pay compensatory damages which any covered person is legally entitled to recover from the owner or operator of an underinsured motorist vehicle because of bodily injury:

      1. Sustained by any covered person; and

      2. Caused by an accident.

(Doc. 31, ¶ 6; Doc. 31-1).

The Policy also states, in pertinent part,

<u>Limit of Liability</u>

      3. The limit of liability shall be reduced by all sums paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible.

      \* \* \*

      General Provisions – Underinsured Motorists If there is other applicable similar insurance available under more than one policy or provision of coverage:

      a. In the first year of this policy, prior to the exposure's effective date shown in the Coverage Summary for what will be a covered Segment, we will pay all covered claims up to the limits you have purchased in excess of the total limits of all other policies.

      b. During the first and subsequent years of this policy for those exposures shown effective in the Coverage Summary the following priorities of recovery apply: First The Underinsured Motorists Coverage applicable to the vehicle the covered person was occupying at the time of the accident. Second The policy affording Underinsured Motorists Coverage to the covered person as a named insured or family member. If two or more policies have equal priority, the insurer against whom the claim is first made shall process and pay the claim as if wholly responsible for all insurers with equal priority. The insurer is thereafter entitled to recover contribution pro rata from any other insurer for the benefits paid and the costs of processing the claim.

(Doc. 31, ¶ 7; Doc. 31-1).

Based upon the terms of the Policy, to recover UIM benefits from Encompass, Foy must demonstrate that the damages he is legally entitled to recover from the other driver exceed $85,000, the sum of the other driver's liability limit and the primary UIM coverage. (Doc. 31, ¶ 8). Encompass conducted a thorough investigation of Foy's claim, but there is a

genuine dispute regarding the nature and extent of his injuries and Plaintiffs' damages.² (Doc. 31, ¶ 9).

On June 12, 2020, Encompass opened a UIM claim on Foy's behalf pertaining to the accident. (Doc. 31, ¶ 10; Doc. 31-2, at 41). The UIM claim was assigned to Raymond Napkora. ("Napkora"). (Doc. 31, ¶ 11; Doc. 31-2, at 41). On June 15, 2020, June 16, 2020, June 25, 2020, and June 26, 2020, Napkora called Foy's counsel and left messages requesting a return call.³ (Doc. 31, ¶ 12; Doc. 31-2, at 41). Foy's counsel did not return Napkora's call.

---

² Plaintiffs deny this statement. (Doc. 33-5, ¶ 9). Without a supporting citation to the record, Plaintiffs state:

> As set forth in the accompanying Brief in Opposition, the Defendant, Encompass Home and Auto Insurance Company, while relying upon the false theories and opinions of an "informant" who is friends with Encompass agent, David Bertram, a gentleman with a personal and financial interest, and conflict with Plaintiff, Ronald Foy, has ignored all relevant evidence presented by the Plaintiffs on their behalf and chosen to create every possible reason not to make a single settlement offer under the subject Underinsured Motorist (UIM) policy despite the value of the claim clearly being in excess of the $85,000.00 credit referenced above. The Plaintiffs have presented credible expert reports setting forth over $2,000,000.00 in economic loss alone. After Discovery re-opens, David Bertram will be deposed and questioned about his agency's commission incentives, agent bonuses and other consideration paid by carriers, such as Encompass, to his agency. Therefore, Bertram's calls to the Encompass adjusters, and their leading an investigation based on the information he and his "informant" provided, borders on illegal conduct. As further set forth in the accompanying Brief in Opposition, David Bertram is the brother-in-law of the City of Wilkes-Barre's attorney who was hired to refute whether Ronald Foy was injured on June 11, 2018.

(Doc. 33-5, ¶ 9).

³ Plaintiffs deny this statement in part, admitting only that their counsel received a message from Napkora on June 25, 2022. (Doc. 33-5, at ¶ 12). Based on the record and the rest of his assertions, it is likely Plaintiffs meant to state June 25, *2020*. Plaintiffs contend that their counsel has no record of a message left by Napkora on June 15, 2020, or June 26, 2020. (Doc. 33-5, ¶ 12).

(Doc. 31, ¶ 13; Doc. 31-2, at 40). Napkora called Foy's counsel again on June 29, 2020.[4] (Doc. 31, ¶ 14; Doc. 31-2, at 40). During the call on June 29, 2020, Foy's counsel told Napkora that Foy was operating a 2008 Chevy Impala ("Impala") owned by the City of Wilkes-Barre at the time of the accident. (Doc. 31, ¶ 15; Doc. 31-2, at 40).  Napkora spoke with Foy's counsel again on July 3, 2020. (Doc. 31, ¶ 16; Doc. 31-2, at 38). During the July 3, 2020 telephone call, Foy's counsel told Napkora that the third-party driver involved in the accident had $50,000 in liability coverage and the City of Wilkes-Barre had $35,000 in primary UIM coverage. (Doc. 31, ¶ 17; Doc. 31-2, at 38). Foy's counsel told Napkora that the underlying liability claim had not been resolved yet. (Doc. 31, ¶ 18; Doc. 31-2, at 38). Napkora noted that Foy's counsel told him that Foy's injuries "started as cervical and concussion, [and] moved to balance and neurological issues."[5] (Doc. 31, ¶ 19; Doc. 31-2, at 38). Foy's counsel also told Napkora that "he did not have the full w/c info for meds, but ended up with a separate fall incident with several fractures (we would not relate this)."[6] (Doc. 31, ¶ 20; Doc.

---

[4] Plaintiffs deny this statement, claiming their counsel returned Napkora's message from June 25, 2020, from his cell phone "on multiple occasions." (Doc. 33-5, ¶ 13). Plaintiffs also provide, "this alleged matter is neither material nor relevant to Defendants motion for partial summary judgment." (Doc. 33-5, ¶ 13).

[5] Plaintiffs deny this statement "as it is stated." (Doc. 33-5, ¶ 19). According to Plaintiffs, during a phone call on July 3, 2020, their counsel informed Napkora that Foy had suffered a head injury that resulted in "post-concussion syndrome and cognitive and neurological deficits and symptoms," along with his other injuries. (Doc. 33-5, ¶ 19).

[6] Plaintiffs deny this statement in part, providing:

> It is admitted that counsel for the Plaintiffs informed Mr. Napkora on July 3, 2020 that he was waiting for a full and complete copy of the Workers' Compensation file, a case that was handled by another law firm. Plaintiffs' counsel did inform Mr. Napkora during said conversation that Ronald Foy suffered a subsequent fall in Ocean City, Maryland due to his ongoing neurological and balance issues stemming from the subject accident of June 11,

31-2, at 38). The "separate fall incident" occurred eighteen months after the accident.[7] (Doc. 31, ¶ 21). Napkora concluded that Foy's counsel was "not yet in position to resolve the underlying case." (Doc. 31, ¶ 22; Doc. 31-2, at 38).

On July 6, 2020, Foy's UIM claim was reassigned to Melissa Devlin ("Devlin"). (Doc. 31, ¶ 23; Doc. 31-2, at 38). On that same date, Devlin reviewed the claim and informed Foy's counsel of her assignment. (Doc. 31, ¶ 24; Doc. 31-2, at 38; Doc. 31-3). On July 21, 2020, Devlin received a voicemail from Foy's counsel stating that he had sent a demand package to her. (Doc. 31, ¶ 25; Doc. 31-2, at 38). On July 21, 2020, Devlin left a voicemail for Foy's counsel stating that she had not received the demand package. (Doc. 31, ¶ 26; Doc. 31-2, at 37-38).

Devlin spoke with Foy's counsel on July 27, 2020. (Doc. 31, ¶ 27; Doc. 31-2, at 37). During the July 27, 2020 conversation, Foy's counsel told Devlin that the third-party driver's insurer had tendered the $50,000 liability limit. (Doc. 31, ¶ 28; Doc. 31-2, at 37). Foy's counsel told Devlin that Foy was still pursuing $35,000 in primary underinsured motorist benefits from the insurance company that insured the vehicle he was operating at the time of the

---

2018. It is unclear what the Defendant alleges in paragraph 20 "we would not relate this". If that is meant to convey that Plaintiffs' counsel stated that they were not going to relate the fall to the claim, it is hereby denied. If this statement, however, is setting forth the Defendant's position on the subsequent fall, the Plaintiffs are without enough information to respond to this statement as it appears to be an opinion of an adjuster or attorney on behalf of the Defendant.

(Doc. 33-5, ¶ 20).

[7] Plaintiffs admit this statement, with the clarification that, while Foy did suffer a fall eighteen months after the accident, his counsel told Napkora that the fall was a result of the "ongoing neurological and balance symptomology that he suffered and [was] treated for" since the accident. (Doc. 33-5, ¶ 21).

8

accident. (Doc. 31, ¶ 29; Doc. 31-2, at 37). Foy's counsel also agreed that Encompass was entitled to a total credit of $85,000. (Doc. 31, ¶ 30; Doc. 31-2, at 37). During the July 27, 2020 telephone conversation, Devlin told Foy's counsel that she had not received the demand package and counsel agreed to re-send it. (Doc. 31, ¶ 31; Doc. 31-2, at 37). Also on July 27, 2020, Devlin received some medical records from Foy's counsel via email, but counsel indicated that additional records would be forthcoming. (Doc. 31, ¶ 32; Doc. 31-4).

Throughout August and September, Devlin received some medical records from Foy's counsel, acknowledging them upon receipt. (Doc. 31, ¶ 33; Doc. 31-2, at 34-37; Doc. 31-5; Doc. 31-6; Doc. 31-7; Doc. 31-8; Doc. 31-9). Devlin noted that in cover correspondence, Foy's counsel sought to relate the post-accident fall and resulting surgeries to the accident. (Doc. 31, ¶ 34; Doc. 31-2, at 35).

On October 12, 2020, Devlin conducted a review of all of the medical records provided by Foy's counsel.[8] (Doc. 31, ¶ 35; Doc. 31-2, at 33-34). Despite Foy's counsel's assertions about the post-accident fall and resulting surgeries, the documentation Devlin received did not include any actual records regarding Foy's post-accident fall or bilateral knee surgeries.[9] (Doc. 31, ¶ 36; Doc. 31-2, at 33-34). Devlin sent a letter to Foy's counsel requesting records regarding Foy's knee injuries, emergency room records, and medical records for the five years

---

[8] Plaintiffs deny this statement, claiming that they do not have the information needed to verify whether or not Devlin reviewed the medical records on October 12, 2022. (Doc. 33-5, ¶ 35). Again, the Court assumes Plaintiffs intended to state October 12, *2020*, instead of October 12, 2022.

[9] Plaintiffs admit this statement with the following clarification: "Plaintiffs' counsel had requested medical records from the medical providers in Ocean City, Maryland, the location of Plaintiff, Ronald Foy's, subsequent fall. Plaintiffs' counsel agreed to provide said records upon receipt of the same, which was completed." (Doc. 33-5, ¶ 36).

9

prior to the accident. (Doc. 31, ¶ 37; Doc. 31-10). That same day, an informant told Devlin that evidence in litigation between Foy and the City of Wilkes-Barre showed that the other vehicle involved in the accident was "going less than 5 mph at the time of impact," that at the time of the accident Foy was returning to the police station to be "reprimanded," that Foy had been demoted prior to the accident, that Foy's post-accident fall occurred at a festival in Ocean City, Maryland, and the medical reports for the post-accident fall did not mention dizziness, "just that alcohol may have been involved."[10] (Doc. 31, ¶ 38; Doc. 31-2, at 33-34).

---

[10] Plaintiffs deny this statement and provide the following explanation:

According to the October 12, 2020, 03:41:05 PM claims note of Melissa Devlin (Foy 100032), Miss Devlin did not receive information from an "informant." Defendant, Encompass Home and Auto Insurance Company, has never disclosed the identity of the "informant." The Defendant has developed a theory in opposition to the Plaintiffs' claim for UIM benefits based upon an unknow "informant." Certain information contained in Paragraph 38 of the Defendant's Concise Statement of Undisputed Material Facts are wrong and subsequent verification during the pendency of this case confirmed that said information was wrong. Specifically, it is denied that the other vehicle involved in the accident was going less than five miles per hour. Specifically, Plaintiff, Ronald Foy, indicated during his statement under oath on November 19, 2022, that the driver that rearended him appeared to be going between five to ten miles per hour. See Exhibit "A" at 42. There were no witnesses to the subject motor vehicle accident other than the two drivers involved, Ronald Foy and Alexis Yeager. According to USAA, Miss Yeager never indicated how fast she was going at the time of the rearend impact that caused Mr. Foy's injuries. Furthermore, the Crash Data Retrieval (CDR) report relied upon by the Defendant confirms that "SDM recorded vehicle speed accuracy can be affected by various factors, including but not limited to the following: ... wheel lock up and wheel slip." See Exhibit "B". To that affect, Plaintiff, Ronald Foy, testified during his statement under oath that at the time of impact his foot was on the break to the point where the wheels locked and his car did not roll forward upon impact, however his vehicle was pushed forward a couple of inches. See Exhibit "A", at 48. The CDR crash data retrieval port does not indicate how fast the other driver was going at the time of impact. See. Exhibit "B". Regardless of how fast the other driver was going at the time she rearended the Plaintiffs vehicle, Ronald Foy sustained a noticeable bruise to the back of his head from the impact. See Exhibit "A", at 57; See Exhibit "C". The bruising on the back of Ronald Foy's head is noted in the initial emergency room records. See Exhibit "C". Second, Plaintiff, Ronald Foy, was not on his way to the police station to be "reprimanded." In fact, Ronald Foy testified during his deposition that he was on his way to a meeting with a

10

Devlin requested Encompass's special investigations unit ("SIU") assist with the investigation of Foy's post-accident fall.[11] (Doc. 31, ¶ 39; Doc. 31-2, at 33). On October 13, 2020, SIU claim representative Michele Grossman ("Grossman") reviewed the claim. (Doc. 31, ¶ 40; Doc. 31-2, at 33).

On October 20, 2020, Grossman emailed Foy's counsel that "Encompass has retained the law firm of Marshall Dennehey to conduct your client's examination under oath ("EUO") and their office will be contacting you directly to schedule same. Encompass is also seeking additional medical records as part of our investigation and evaluation of your client's claim." (Doc. 31, ¶ 41; Doc. 31-2, at 31). Also on October 20, 2020, lawyer Robert Smith ("Smith"),

---

case worker from Children and Youth. See Exhibit "D", at 101. Third, it is admitted with clarification that Ronald Foy was "demoted" from Commander of Patrol to his original position of Detective. However, as Ronald Foy testified, he was beyond thrilled to no longer hold the political position of Commander as he had a passion working as a detective to investigate and bring to justice the victims of child sex abuse cases. See Exhibit "D". Fourth, it is false that Ronald Foy's subsequent fall occurred at a "Festival" in Ocean City, Maryland. Ronald Foy testified during his deposition that he suffered a subsequent fall, in Ocean City, Maryland, after getting dizzy and losing his balance walking on the street on the way to the boardwalk. See Exhibit "D", at 68-69. Mr. Foy had not yet attended the festival, which was scheduled for the following day. His fall was witnessed by his wife and son. See Exhibit "D". Fifth, the "just that alcohol may have been involved" is incorrect, speculation, and hearsay. Ronald Foy and Gwen Foy both testified that Ronald had not had a drink of alcohol since dinner in the hours preceding his dizzy spell and fall on the street in Ocean City, Maryland. See Exhibit "D" at 68, See Exhibit "E" at 24-25. The record from the Ocean City, Maryland emergency room contains no blood alcohol level nor is there any other evidence to suggest that Ronald Foy was impaired from alcohol at the time of his subsequent fall. The "informant" who fed the Defendant false information was incorrect, or simply lied. The information provided by the "informant" was disproven pre and post-lawsuit.

(Doc. 33-5, ¶ 38).

[11] Plaintiffs submit that they lack adequate information to admit or deny Devlin's actions regarding the SIU request pertaining to Foy's Ocean City, Maryland fall. (Doc. 33-5, ¶ 39).

11

from the law firm Marshall Dennehey emailed Foy's counsel and advised that he had been retained to represent Encompass with respect to the UIM claim. (Doc. 31, ¶ 42; Doc. 31-11). Smith requested a date to conduct Foy's statement under oath, records relating to Foy's worker's compensation claim for the accident, and medical records related to the post-accident fall. (Doc. 31, ¶ 43; Doc. 31-11). Smith took Foy's examination under oath on November 19, 2020. (Doc. 31, ¶ 44; Doc. 31-2, at 28). In December 2020, Smith requested that Foy undergo an independent neuropsychological evaluation with Dr. Idit Trope. (Doc. 31, ¶ 45).

On January 18, 2021, Encompass's counsel sent an email to Foy's counsel, stating, in pertinent part:

> As a follow up to our telephone conversation this afternoon, please be advised that our evaluation of this UIM claim is ongoing and there is additional information we have requested to further evaluation the claim and the policy limit demand. For example, we have requested authorizations to obtain records from Mr. Foy's healthcare providers as well as additional records relating to his workers compensation claim. We have also scheduled Mr. Foy for a neuropsychological evaluation with Dr. Trope. We will likely be requesting an orthopedic exam as well, but would like to obtain some additional records before completing that exam. For example, we have not yet received any medical records relating to Mr. Foy's fall in early 2020.

(Doc. 31, ¶ 46; Doc. 31-2, at 23-24).

On January 27, 2021, Dr. Trope, a neuropsychologist retained by Encompass, completed an independent medical examination of Foy. (Doc. 31, ¶ 47; Doc. 31-12). After her examination, Dr. Trope wrote:

> Thus, while Mr. Foy attributes all his symptoms to the 2018 MVA, there are multiple documents highlighting significant medical and psychiatric history long predating the accident. Furthermore, by all objective indicators, Mr. Foy suffered no more than a mild concussion (no loss of consciousness was reported in the ER, GCS was 15, indicating no alteration of consciousness, he even drove himself to the police station, no concussion related findings on imaging studies). Following mild concussion, symptoms improve within the following

weeks and months or reach a plateau. The pattern of waxing and waning cognitive complaints reported by Mr. Foy is inconsistent with the known sequelae of a mild concussion. Of most significance, on the present evaluation, Mr. Foy did not put forth good effort, and failed measures of symptoms validity, and thus, his performance on the present evaluation does not reflect his true neuropsychological abilities, and more than likely underestimates his true level of functioning. In conclusion, there is no causal explanation that would link Mr. Foy's current neuropsychological presentation to the 2018 accident, and there is no basis to conclude that Mr. Foy sustained any sequelae or permanent neuropsychological deficits that are attributable to the 06/11/2018 accident.[12]

(Doc. 31, ¶ 48; Doc. 31-12).

On March 23, 2021, Grossman noted that she was still waiting to receive the medical records she had requested from Foy regarding his post-accident fall. (Doc. 31, ¶ 49; Doc. 31-2, at 20).

On April 13, 2021, Grossman reviewed the claim with her supervisor, Damon Gutman ("Gutman").[13] (Doc. 31, ¶ 50; Doc. 31-2, at 19). Gutman noted that Foy "has not cooperated for [an orthopedic independent medical examination]. Also we just [received] 600 pages of records that need to be reviewed and sent to expert. Our neuro expert has reviewed already and appears to indicate the neuro injuries being associated to the loss don't align with the type

---

[12] Plaintiffs admit this statement with the following clarification:

The Court should be aware that although the Defendant lists Miss Trope as "Dr. Trope," she is not a medical doctor. She is simply a PhD and not qualified to render a medical diagnosis of whether a patient sustained a traumatic brain or head injury. It was not until years later that the Defendant sent Plaintiff, Ronald Foy, for an Independent Medical Evaluation (IME) with a medical doctor for his traumatic head/brain injury.

(Doc. 33-5, ¶ 48).

[13] Plaintiffs claim they are not in the position to admit or deny whether a conversation between Grossman and Gutman occurred on April 13, 2021. (Doc. 33-5, ¶ 50).

of impact and injuries sustained."[14] (Doc. 31, ¶ 51; Doc. 31-2, at 19). On April 26, 2021, Grossman retained a biomechanical engineer, Leroy Waite ("Waite"), to provide an expert biomechanical analysis of the accident.[15] (Doc. 31, ¶ 52; Doc. 31-2, at 16). On or about May 5, 2021, Encompass's counsel emailed Foy's counsel and requested that Foy undergo an orthopedic independent medical examination. (Doc. 31, ¶ 53).

On June 16, 2021, the UIM claim was reassigned to Lisa Frey ("Frey"). (Doc. 31, ¶

---

[14] Plaintiffs deny this statement, again stating that Dr. Trope is not a medical doctor. (Doc. 33-5, ¶ 51). Plaintiffs go on to explain that in her report, Dr. Trope specified that she did not review Foy's hospital records following the motor vehicle accident at issue. (Doc. 33-5, ¶ 51). Further, "Trope was never asked to review the deposition testimony of Mallorie Liller, the Children and Youth caseworker who met with Ronald Foy immediately after his June 11, 2018 accident. Detective Foy was on his way to a meeting with a Children & Youth caseworker, Mallory Liller ("Liller"), to review ongoing child sexual abuse investigations he was assigned to." (Doc. 33-5, ¶ 51; Doc. 33-9). Plaintiffs aver that despite the accident, Foy went to his meeting with Liller, and she indicated he was confused, had an altered personality, and had memory loss during the meeting. (Doc. 33-5, ¶ 51; Doc. 33-11). This prompted Liller to urge Foy to go to the emergency room and get medical attention. (Doc. 33-5, ¶ 51; Doc. 33-11). Foy went to the emergency room at Wilkes-Barre General Hospital, where personnel noted bruising on his head and diagnosed him with "a closed head injury," as well as "secondary injuries." (Doc. 33-5, ¶ 51; Doc. 33-8).

[15] Plaintiffs state:

It is neither admitted or denied that a biomechanical engineer, namely Leroy Waite, was retained by Miss Grossman on April 26, 2021 as Mr. Waite's report has never been produced to the Plaintiffs as of the date it filed the instant Motion for Partial Summary Judgement. The Defendant did not attach Mr. Waite's alleged report to its Motion for Summary Judgment, Brief in Support, or Concise Statement of Facts. The Court should disregard Mr. Waite's alleged report, and any reference or argument thereto, for purposes of deciding the instant Motion for Partial Summary Judgment.

(Doc. 33-5, ¶ 52).

14

54; Doc. 31-2, at 12). Frey reviewed the claim that same day.[16] (Doc. 31, ¶ 55; Doc. 31-2, at 12). Frey noted that Foy's prior medical records were still outstanding and that the orthopedic medical examination was still pending. (Doc. 31, ¶ 56; Doc. 31-2, at 12).

On September 15, 2021, Dr. Eugene Kim ("Dr. Kim") completed an orthopedic independent medical exam of Foy. (Doc. 31, ¶ 57; Doc. 31-13). On February 11, 2022, Encompass received Dr. Kim's report.[17] (Doc. 31, ¶ 58; Doc. 31-2, at 2). In the report, Dr. Kim opines:

> As a result of his motor vehicle accident, Mr. Foy would not require any restrictions with respect to any orthopedic injuries. The claimant subsequently sustained an injury to both his knees consisting of patellar tendon ruptures in 2020. These injuries are not causally related to the motor vehicle in question. No orthopedic injuries sustained in the motor vehicle accident in question contributed to his patellar tendon injuries. He would require no further treatment.[18]

---

[16] Plaintiffs assert they are not in the position to admit or deny whether Fray reviewed the claim on June 16, 2021. (Doc. 33-5, ¶ 55). The Court assumes Plaintiffs are referring to *Frey*.

[17] Plaintiffs deny this statement and contest that it took Dr. Kim five months to write a narrative report for Encompass. Plaintiffs state that five months is beyond the length of time it takes to write and produce an independent medical exam report. (Doc. 33-5, ¶ 58). Plaintiffs provide, with no support, that a five-month delay typically indicates a request to amend, clarify, or correct the original report that was produced. (Doc. 33-5, ¶ 58).

[18] Plaintiffs admit this statement with the following clarification:

> Although Dr. Kim's opinions are referenced in his report, Dr. Kim never reviewed the deposition transcripts of the witnesses to Ronald Foy's subsequent fall on February 28, 2020 which would have provided information as to the circumstances that caused Ronald Foy to lose his balance and fall on that date. Dr. Kim, an orthopedic doctor, is not qualified to render an opinion of whether Ronald Foy's neurological injury may or may not have caused instability or balance issues as it is outside of his specialty. It is not disputed that Ronald Foy sustained bilateral patellar tendon ruptures on February 20, 2020, nor that he underwent two surgeries to repair the same on later dates. The Plaintiffs never

(Doc. 31, ¶ 59; Doc. 31-13).

Plaintiffs filed their complaint on February 7, 2022. (Doc. 31, ¶ 60; Doc. 1). Waite's biomechanical report was not completed prior to the filing of the lawsuit. [19] (Doc. 31, ¶ 61; Doc. 31-2, at 7). Still, the worker's compensation insurer obtained an engineering report regarding the accident, which notes that the police report indicates that Foy's vehicle "sustained a very small amount of damage to the rear bumper" and opined that "Foy sustained a change-of-velocity or delta-V of about 3 mph during the collision, which is less than the minimum 5 mph SDM recorded velocity change needed to record a non-deployment event [in the airbag control module]." [20] (Doc. 31, ¶ 62; Doc. 31-14).

---

claimed that Ronald Foy sustained said patellar tendon injuries on June 11, 2018.

(Doc. 33-5, ¶ 59).

[19] Plaintiffs state they cannot admit or deny whether Waite completed a biomedical report because the report was not provided for the purpose of this motion. (Doc. 33-5, ¶ 61). Plaintiffs further request this Court disregard the alleged report and any references thereto for the purpose of this motion. (Doc. 33-5, ¶ 61).

[20] In response to this statement, Plaintiffs submit;

> Although Mr. Hudak sets forth an opinion regarding an alleged change of velocity concerning Mr. Foy's vehicle, he chose to ignore the clear language in the CRD - Crash Data Retrieval Report which states that vehicle speed accuracy can be affected by various factors, including "wheel lock up and wheel slip." See Exhibit "B". As set forth above, Ronald Foy's foot was pressed against the brake at all times which caused wheel lock up and prevented his vehicle from rolling forward, which would cause any CDR reporting of impact to be inaccurate, the document clearly states, as relevant to opining the speed of the vehicle who impacted Ronald Foy's car on June 11, 2018. Encompass did not provide Mr. Hudak with copies of the Plaintiffs Statement Under Oath (pre-suit) or his Deposition Transcript which was/is relevant to his interpreting the CRD Report.

(Doc. 33-5, ¶ 62; Doc. 33-7).

IV. **DISCUSSION**

Plaintiffs' bad faith claim is predicated on 42 Pa. C. S. § 8371. To prevail on a bad faith claim in Pennsylvania at the summary judgment stage, a plaintiff must provide clear and convincing evidence that 1) there was no reasonable basis for the insurer to deny benefits and 2) the insurer knew or had reason to know it lacked a reasonable basis to deny benefits. *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005); *see also Shaffer v. State Farm Mut. Auto. Ins. Co.*, 643 F. App'x 201, 204 (3d Cir. 2016). This "standard requires that the plaintiff show 'the evidence is so clear, direct, weighty [,] and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant[ ] acted in bad faith." *Shaffer*, 643 F. App'x at 204 (quoting *Bostick v. ITT Hartford Grp.*, Inc., 56 F.Supp.2d 580, 587 (E.D. Pa. 1999) (internal citations omitted)). "The insured must ultimately show that 'the insurer breached its duty of good faith through some motive of self-interest or ill will.'" *Babayan*, 430 F.3d at 137 (quoting *Brown v. Progressive Ins. Co.*, 2004 PA Super 346, 860 A.2d 493, 501 (2004)). "A claim for bad faith may [also] be premised on an insurer's bad faith in investigating a claim, such as by failing to conduct a good faith investigation into the facts or failing to communicate with the claimant." *Shaffer*, 643 F. App'x at 204; *see Johnson v. Progressive Ins. Co.*, 2009 PA Super 255, 987 A.2d 781, 784 (2009). The question of bad faith should not be submitted to a jury unless it appears the insurer had no reasonable basis for "relying upon its defense to liability." *Stanford v. Nat'l Grange Ins. Co.*, 64 F. Supp. 3d 649 (E.D. Pa. 2014) (quoting *D'Orazio v. Hartford Ins. Co.*, No. 09-CV-0403, 2011 WL 1756004, at *4 (E.D. Pa. May 6, 2011), *aff'd*, 459 F. App'x 203 (3d Cir. 2012) (internal citations omitted)).

Viewing the evidence in a light most favorable to Plaintiffs as the non-moving party, the Court finds no reasonable fact finder could conclude that Plaintiffs have proven

Encompass acted in bad faith by clear and convincing evidence. *See Rossi v. Progressive Ins.*, 813 F. Supp. 2d 643, 653 (M.D. Pa. 2011) (awarding Defendant-Insurance Company summary judgment on an insurance bad faith claim because the plaintiffs failed to prove their claim through clear and convincing evidence). Plaintiffs contend Encompass acted in bad faith because they "grossly undervalued Plaintiff's UIM claims and ignored evidence." (Doc. 33, at 12). Specifically, Plaintiffs first allege their claim was investigated by a biased agent "who could suffer a loss of agency bonuses and commission incentives if this UIM claims is paid out." (Doc. 33, at 12). Plaintiffs then further aver that "[e]very Encompass adjuster who handled this matter has looked for any reason not to pay the Plaintiffs the UIM benefits they are entitled to, and in turn have turned a blind eye to every piece of evidence that proves Detective Foy sustained a concussion, head injury, and is disabled from engaging in any meaningful employment." (Doc. 33, at 12-13).

      While these allegations could suggest Encompass potentially acted in bad faith, Plaintiffs have pointed to no evidence in the record that suggests any agent or adjuster tasked with investigating Foy's claim had a personal or financial interest in its outcome or a conflict with Foy. Additionally, Plaintiffs have provided no evidence that any of the actors involved with Foy's claim purposefully turned a blind eye to the injuries Foy alleges he sustained as a result of the accident. Instead, the record reflects that Encompass conducted a reasonably extensive and objective investigation. First, Encompass requested and received medical records from Plaintiffs' counsel. (Doc. 31, ¶¶ 32, 33, 35, 37; Doc. 31-2, at 33-35). Encompass's review of Foy's medical records was complicated, however, by Foy's counsel's refusal to supply them with certain records, specifically those pertaining to a fall Foy suffered eighteen months after the accident. (Doc. 31, ¶¶ 34, 36, 39, 41, 43, 49, 56; Doc. 31-2, at 12, 32-34; Doc.

31-11, at 3-4). Encompass then enlisted their SIU to investigate Foy's injuries and even employed a neuropsychologist, Dr. Trope, to complete an independent medical evaluation of Foy's symptoms. (Doc. 31, ¶¶ 39, 47-48; Doc. 31-12). After an extensive review of Foy's medical records and an interview with Foy, Dr. Trope concluded "while Mr. Foy attributes all his symptoms to the 2018 MVA, there are multiple documents highlighting significant medical and psychiatric history long predating the accident." (Doc. 31, ¶¶ 47-48; Doc. 31-12, at 17-18). Encompass also arranged for Foy to undergo an orthopedic independent medical exam, which was conducted by Dr. Kim. (Doc. 31, ¶ 59, Doc. 31-13, at 12). Dr. Kim concluded that some of the injuries Foy attributed to the accident were not "casually related to the motor vehicle in question," and that Foy would not require further treatment. (Doc. 31, ¶ 59, Doc. 31-13, at 12). Lastly, whereas Plaintiffs contend Encompass "turned a blind eye" to Foy's injuries and symptoms, the record reflects Encompass took reasonable steps to understand Foy's medical record to determine which ailments could be attributed to the accident. (Doc. 31-2; Doc. 31-11; Doc. 31-12- Doc. 31-13).

Plaintiffs point to no concrete evidence to support that their case "involves anything but a normal dispute over the value of Mr. Foy's underinsured motorist ("UIM") claim." (Doc. 34, at 1). Thus, while the record may reflect a genuine dispute exists regarding the value of Plaintiffs' claims, given Encompass's extensive investigation, the record does not support that Encompass had no reasonable basis for the valuation of Foy's claim. *See Miezejewski v. Infinity Auto Ins. Co.*, 609 F. App'x 69, 72-73 (3d Cir. 2015) (affirming the district court's award of summary judgment to Defendant-Insurance Company because the agents involved in pursing the claim had acted reasonably and the plaintiffs failed to put forward any evidence the agents' actions were motivated by "self-interest or ill will").

Further, Plaintiffs argue Encompass acted in bad faith because they "ignored" the deposition testimony of Liller, who met with Foy "immediately" after the accident. (Doc. 33-5,¶ 51; Doc. 33-11, at 21). During her deposition, Liller testified that Foy experienced memory issues and "stuttering" speech. (Doc. 33-11, at 22). She also suggested something was off about his personality, so she urged Foy to seek medical care. (Doc. 33-11, at 22). Foy subsequently went to the emergency room. (Doc. 33-11, at 22-23). Without more, Encompass's failure to consider Liller's testimony, which lacks a diagnosis or sound medical opinion, [21] "does not rise to the level of frivolous, reckless disregard, or lack of reasonable basis" to sustain a claim for bad faith. (Doc. 33-11); see *Lawson ex rel. Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 167 (3d Cir. 2002); *cf. Terletsky v. Prudential Property and Casualty Insurance Co.*, 437 PA Super 108, 649 A.2d 680, 688 (1994). Accordingly, Plaintiffs have failed to meet their burden of presenting evidence that is "so clear, direct, weighty [,] and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant[ ] acted in bad faith." *Shaffer*, 643 F. App'x at 204.

V.     **CONCLUSION**

For the reasons set forth in this Memorandum Opinion, Encompass's the Motion for Partial Summary Judgment is **GRANTED.** (Doc. 30). Plaintiffs' bad faith claim, Count II of their Complaint, is **DISMISSED**. (Doc. 1-3, ¶¶ 32-83). An appropriate Order shall follow.

Dated: April 30, 2024                *s/ Karoline Mehalchick*
                                     **KAROLINE MEHALCHICK**
                                     **United States District Judge**

---

[21] Liller's testimony is also plagued by multiple admissions that she "remembers very little." (Doc. 33-11, at 23).